1
2
3
4
5
6
7

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| PRESIDIO HISTORICAL ASSOCIATION and SIERRA CLUB, | No. C 12-00522 LB |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| PRESIDIO TRUST, a federal government corporation | [ECF Nos. 25, 29, 33] |
| Defendant. | |

_____/

**INTRODUCTION**

Plaintiffs Presidio Historical Association and Sierra Club filed this lawsuit against the Presidio Trust (the "Trust"), which is a federal corporation established under the Presidio Trust Act (the "Trust Act"), 16 U.S.C. § 440bb appendix, to manage a part of the Presidio of San Francisco called Area B.  The Presidio is a historically-significant former military base and national landmark that started as a Spanish post in 1776, was controlled by Mexico from 1822 to 1846, and played an active role in every major United States military engagement from 1846 until 1994, when it became part of the national park known as the Golden Gate National Recreation Area ("GGNRA").  *See* 16 U.S.C. § 460bb; Complaint, ECF No. 1, ¶¶ 39-51; Administrative Record ("AR") 27539.[1]  The lawsuit

---

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the page and to the Administrative Record ("AR") Bates-numbered pages.  Citations to the complaint are to allegations that are admitted in correspondingly numbered paragraphs in Defendant's answer.  *See* Complaint, ECF No. 1, ¶¶ 39-51; Answer, ECF

challenges the Trust's February 2011 updated management plan for the development of part of Area B called the Main Post. The plan update (referred to by both parties as the "Main Post Update") includes new construction in the form of a proposed hotel referred to as the Presidio Lodge.

Plaintiffs are non-profit organizations that are involved with the protection and preservation of the historic Presidio and the GGNRA and that participated in the administrative processes that preceded the Main Post Update that authorized the Presidio Lodge project. *See* Complaint, ECF No. 1, ¶¶ 9-10; AR 19591-96 (Sierra Club), 19591-75 (Presidio Historical Association). They charge that the Presidio Trust's adoption of the Main Post Update violated three statutes: (1) the Trust Act by permitting new construction for the Presidio Lodge that exceeds the square footage and footprint of demolished buildings on the Main Post and therefore violates the Trust Act's limits on new construction to "replacement of existing structures of similar size in existing areas of development," (2) section 110(f) of the National Historic Preservation Act ("NHPA") by not minimizing harm to the Presidio as a landmark; and (3) the National Environmental Policy Act ("NEPA") by not considering adequate alternatives to the proposed lodge and by not recirculating for public comment the final environmental impact statement ("EIS"), which scaled back the lodge and dropped the plans for a proposed and controversial art museum. *See* Pls.' Motion, ECF No. 25. The Presidio Trust responds that it complied with all statutes: (1) it did not exceed the Trust Act's limits because it was allowed to use square footage attributable to close-by demolished buildings adjacent to the Main Post; (2) it appropriately minimized harm to the Presidio under the NHPA; and (3) it fully complied with NEPA because it considered adequate alternatives, did not need to circulate a final EIS that only scaled down the project and incorporated proposed changes, and in any event allowed and considered final comments. *See* Def.'s Cross-Motion for Summary Judgment and Opposition, ECF No. 29.[2]

Under the deferential standard of judicial review that applies to final agency action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, this order upholds the agency decision,

No. 8, ¶¶ 39-51. The order cites only the complaint's allegations.

[2] The court allowed the National Trust for Historic Preservation ("National Trust") to file an *amicus curiae* brief. *See* Order, ECF No. 42; Corrected *Amicus Curiae Brief*, ECF No. 39.

*(left margin)* UNITED STATES DISTRICT COURT
For the Northern District of California

denies Plaintiffs' Motion for Summary Judgment, and grants the Trust's Cross-Motion for Summary Judgment.

**STATEMENT**

## I.  FROM ARMY BASE TO NATIONAL PARK

In 1972, Congress passed the Golden Gate National Recreation Area ("GGNRA") Act, 16 U.S.C. § 460bb, *et seq.*   The Act created the Golden Gate National Recreation Area, which included the Presidio in its boundaries, to "preserve for public use and enjoyment certain areas . . . possessing outstanding natural, historic, scenic, and recreational values, and in order to provide for the maintenance of needed recreational open space necessary to urban environment and planning."  16 U.S.C. § 460bb.  The Act gave the Secretary of the Interior an irrevocable right of use and occupancy for portions of the Presidio and required transfer of the remainder of the Presidio to the Department of the Interior when the Department of the Defense determined that it no longer needed it. *See* 16 U.S.C. § 460bb-2(d).  That happened on September 30, 1994.  AR 3477-80.

Under section 1 of the GGNRA Act, the Secretary of the Interior:

> shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management.  In carrying out the provisions of this subchapter, the Secretary shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area.

16 U.S.C. § 460bb.

The National Park Service ("NPS") prepared a General Management Plan for the Presidio in 1980, and it adopted the Final General Management Plan Amendment in 1994.  *See* AR 34530, 34512-79, 27432, 27688-89.  That plan projected annual costs of $40 million and capital improvement costs of $741 million.  AR 27689, 34668.

## II. THE TRANSFER OF ADMINISTRATION TO THE PRESIDIO TRUST

In 1996, Congress passed the Presidio Trust Act, which modified the GGNRA Act and transferred administrative jurisdiction of Area B of the Presidio (including the Main Post) from the Department of the Interior to "a wholly owned government corporation to be known as the Presidio Trust."  Section 103, Presidio Trust Act, 16 U.S.C. § 460bb appendix.  Area B is 80% of the Presidio and covers most of the inland areas.  *See* AR 27526.  The National Park Service administers the

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1   primarily-coastal lands in Area A and other parts of the GGNRA in San Francisco and Marin

2   counties. *See id.*

3      The Trust's authority for Area B is to "manage the leasing, maintenance, rehabilitation, repair

4   and improvement of property within the Presidio . . . in accordance with the purposes set forth in

5   section 1" of the GGNRA Act (quoted in the previous section) and the General Management Plan

6   approved for the Presidio. *Id.* § 104(a). The Act required the Trust to develop a program for

7   managing the lands and facilities under its jurisdiction "to reduce expenditures by the National Park

8   Service and increase revenues to the Federal Government to the maximum extent possible." *Id.*

9   § 104(c). The Act required the program to consist of the following:

10      (1) demolition of structures which in the opinion of the Trust, cannot be cost-effectively
        rehabilitated, and which are identified in the management plan for demolition,

11

12      (2) evaluation for possible demolition or replacement those buildings identified as categories
        2 through 5 in the Presidio of San Francisco Historic Landmark District Historic Report,
        dated 1985,

13

14      (3) new construction limited to replacement of existing structures of similar size in existing
        areas of development, and

15      (4) examination of a full range of reasonable options for carrying out routine administrative
        and facility management programs.

16

17   *Id.* (also required the Trust to consult with the Secretary of the Interior during the preparation of the

18   program).

19      The Trust's plan had to include "a schedule of annual decreasing federally appropriated funding

20   that will achieve, at a minimum, self-sufficiency for the Trust within 15 years . . . ." *Id.* § 105(b). If

21   the Trust failed to accomplish the plan's goals and objectives within 15 years, including economic

22   self-sufficiency, then federal funding would cease, and the Trust-administered property would

23   transfer to the General Services Administration to be sold under the terms of the Defense

24   Authorization Act of 1990. *Id.* § 104(o); *see* Cross-Motion, ECF No. 29 at 10.

25      The Presidio Trust Board of Directors held its first meeting on July 9, 1997 and assumed

26   administrative jurisdiction over Area B on July 1, 1998. AR 27688. In 2002, under its statutory

27   mandate to develop a comprehensive management plan for Area B, the Trust adopted the Presidio

28   Trust Management Plan. In a Record of Decision issued on February 23, 2011, the Trust amended

UNITED STATES DISTRICT COURT
For the Northern District of California

the plan by issuing the "Main Post Update" to authorize development in the Main Post area, including the challenged development of the Presidio Lodge. Complaint, ECF No. 1 at 2. Before issuing the Main Post Update Record of Decision, the Trust analyzed potential environmental impacts of the proposed action and alternatives under the NEPA, and it addressed minimizing impact under NHPA. The next sections first examine the statutory framework for the NHPA and the NEPA and then review the Trust's development of the 2002 plan and 2011 Main Post update.

## III. THE NATIONAL HISTORIC PRESERVATION ACT

The National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, encourages the preservation of historic resources and directs federal agencies to assume responsibility for considering historic resources while carrying out their duties. *See generally* 16 U.S.C. § 470, *et seq*. The NHPA authorizes the Secretary of the Interior to expand and maintain a National Register of Historic Places, *id.* § 470a(1)(A), creates a designation for National Historic Landmarks, *id.* § 470a(1)(B), encourages State and local preservation programs, *id.* § 480a(b), and establishes the Advisory Council on Historic Preservation ("Advisory Council"), *id.* § 470i (1994).

NHPA sections 106, 213, and 110 are relevant to the pending motions.

### A. Section 106

"Section 106 is a procedural statute that requires agency decisionmakers to 'stop, look, and listen,' but not to reach particular outcomes." *Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Admin.*, 463 F.3f 50, 60 (1st Cir. 2006). Where an agency is involved with a project that may affect a historic property, section 106 requires the agency to (1) consider the impact of the project on historic properties and (2) seek the Advisory Council's comments on the project. 16 U.S.C. § 470f. *Id.* More specifically,

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.

*Id.* Congress delegated authority to the Advisory Council to promulgate regulations to define how

UNITED STATES DISTRICT COURT
For the Northern District of California

federal agencies meet this statutory responsibility. *See* 16 U.S.C. § 470s; 36 C.F.R. § 800.1. The regulations establish a four-step consultation process. The goal is to accommodate preservation concerns with federal needs through consultation among the agency and other interested parties to identify properties that may be affected, assess the effects, and "seek ways to avoid, minimize, or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1.

The four steps are as follows. First, the federal agency determines whether the proposed action is an "undertaking",[3] and if so, whether it has the potential to cause effects on historic properties. *Id.* § 800.3(a). Second, if it is an undertaking that could cause effects, then the agency identifies affected properties. *Id.* § 800.3(a)(1). Third, the agency assesses adverse effects. *Id.* §§ 800.4-800.5.[4] Fourth, if there is an adverse effect, then the agency must consult with the relevant parties, the public, and, in cases involving an adverse effect on a National Historic Landmark, the Advisory Council "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a). When the Council participates, the consultation also includes relevant state and tribal historic preservation officers. *Id.* § 800.6(b)(2). If the agency, Council, and historic preservation officers agree on how to resolve the adverse effects, they sign a memorandum of agreement or, in particularly complex situations, a programmatic agreement, which satisfies the agency's section 106 responsibilities. *Id.* §§ 800.6(b), 800.14(b).

---

[3] An "Undertaking" is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including–

    (A) those carried out by or on behalf of the agency;
    (B) those carried out with Federal financial assistance;
    (c) those requiring a Federal permit license, or approval; and
    (D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

16 U.S.C. § 470w(7).

[4] An adverse affect exists when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Registers in a manner that would diminish the property's integrity. *Id.* § 800.5.

UNITED STATES DISTRICT COURT
For the Northern District of California

**B.  NHPA Section 213**

Under section 213, the Advisory Council may request the Secretary of Interior's views on a proposed undertaking to further inform the consultation process.  The Secretary must prepare a report "detailing the significance of [the] historic property, describing the effects of [the] proposed undertaking on the affected property, and recommending measures to avoid, minimize, or mitigate adverse effects."  16 U.S.C. § 470u; *see* 36 C.F.R. § 800.10(c).

**C.  NHPA Section 110**

Section 110 contains requirements for federal agencies that include establishing a historic preservation program, recording information about historic properties that may be destroyed or altered, and designating a preservation officer.  16 U.S.C. § 470h-2(a), (b), and (c).  When the agency action may affect a National Historic Landmark, section 110(f) requires planning and action to minimize harm to the landmark:

> Prior to the approval of any federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

16 U.S.C. § 470h-2(f).  The House Report for the statute explains that section 110 "clarifies and codifies the minimum responsibilities of Federal agencies in carrying out the purpose of" the NHPA and "is not intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders, or regulations."  H.R. Rep. No. 96-1457 at 36 (1980).  With regard to section 110(f), "[t]his section does not supersede section 106, but complements it by setting a higher standard for agency planning in relationship to landmarks before the agency brings the matter to the Council."  *Id.* at 38.

Pursuant to Congress's directive, *see* 16 U.S.C. § 470a(g)*,* the Department of the Interior promulgated guidelines that provide "formal guidance" to federal agencies regarding their responsibilities under section 110.  *See* "Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act," 63 Fed. Reg. 20496-01 at 20496.  When an agency's undertaking directly and adversely affects a National Historic Landmark ("NHL"), "the agency should consider all prudent and feasible alternatives to avoid an

UNITED STATES DISTRICT COURT
For the Northern District of California

1   adverse effect on the NHL." *Id.* at 20503.

2   Where such alternatives appear to require undue cost or to compromise the undertaking's
    goals and objectives, the agency must balance those goals and objectives with the intent of
3   section 110(f). In doing so, the agency should consider:

4   (1) The magnitude of the undertaking's harm to the historical, archaeological and cultural
    qualities of the NHL;

5
    (2) The public interest in the NHL and in the undertaking as proposed, and,
6
    (3) The effect a mitigation action would have on meeting the goals and objectives of the
7   undertaking.

8   *Id.*

9   When section 110(f) applies, the Advisory Council's regulations require Federal agencies to (1)

10  request the Advisory Council to participate in consultations (as discussed on page 6), (2) notify the

11  NPS of any consultation involving a National Historic Landmark, and (3) invite the NPS to

12  participate in the consultation if there may be an adverse effect.  36 C.F.R. § 800.10 (sets forth

13  section 213 process discussed previously).

14  **IV.  THE NATIONAL ENVIRONMENTAL POLICY ACT**

15  The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, requires federal agencies to

16  assess the environmental impacts of proposed federal actions, and reasonable alternatives, before

17  proceeding with a federal action.  As part of this policy, NEPA requires that the federal government

18  use "all practicable means" to "preserve important historic, cultural, and natural aspects of our

19  national heritage."  42 U.S.C. § 4331(b).   NEPA has two goals:  "(1) to ensure the agency will have

20  detailed information on significant environmental impacts when it makes its decisions; and (2) to

21  guarantee that this information will be available to a larger audience."  *Inland Empire Public Lands*

22  *Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996).

23  NEPA is a procedural statute that does not "mandate particular results but simply provides the

24  necessary process to ensure that federal agencies take a hard look at the environmental consequences

25  of their actions."  *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002); *see*

26  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("it is now well settled that

27  NEPA itself does not mandate particular results, but simply prescribes the necessary process").

28  Under NEPA, federal agencies must prepare an environmental impact statement for "major

1   Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

2   § 4332(2)(C); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005)

3   (agency must prepare EIS if "there are substantial questions about whether a project *may* cause

4   significant degradation of the human environment").[5]  The EIS is a detailed statement that describes

5   the environmental impact of the proposed action and includes an analysis of reasonable alternatives

6   to the proposed action.  42 U.S.C. § 4332(2)(C), (E).  An EIS must include a comprehensive

7   discussion of all substantial environmental impacts and inform the public of any reasonable

8   alternatives which could avoid or minimize these adverse impacts.  *See* 40 C.F.R. § 1502.1.  In

9   assessing the adequacy of an agency's EIS, courts apply the "rule of reason" standard which

10  determines whether the EIS contains a "reasonably thorough discussion" of the "probable

11  environmental consequences."  *Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982); *Friends of Yosemite*

12  *Valley v. Norton,* 348 F.3d 789, 801 (9th Cir. 2003) (equating the "rule of reason" standard to an

13  abuse of discretion review).

14      The Council on Environmental Quality ("CEQ"), an agency created by NEPA within the

15  Executive Office of the President, promulgated regulations that guide agencies' compliance with

16  NEPA.  *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500.1-1508.28.  The CEQ's "'interpretation of

17  NEPA is entitled to substantial deference.'"  *League of Wilderness Defenders Blue Mountains*

18  *Biodiversity Project v. Allen*, 615 F.3d 1122, 1136 (9th Cir. 2010) (quoting *Andrus v. Sierra Club*,

19  442 U.S. 347, 358 (1979)).  The regulations set forth steps for public disclosure and involvement in

20  the NEPA process, including the following:

21      (1) publication in the Federal Register of a notice of intent to prepare an EIS, 40 C.F.R. §
        1501.7;

22

23      (2) a public process called "scoping" to determine the scope of issues to be addressed in the EIS
        and identify significant issues related to the proposed action, *id.* § 1501.7(a)(1-7);

24      (3) a draft EIS prepared by the lead agency in accordance with the scope decided on during the
        scoping process, *id.* § 1502.9(a);

25

26      (4) circulation of a draft EIS for comment from the public, appropriate state or local agencies;
        and other federal agencies with a routine comment period of not fewer than 45 days, *id.*

27  _____

28      [5]  An agency may prepare an environmental assessment first to help determine whether a full
    EIS is necessary.  40 C.F.R. § 1508.3.

UNITED STATES DISTRICT COURT
For the Northern District of California

§§ 1502.19, 1503, 1506.10;

(5) preparation of a final EIS that must include a response to the comments on the draft and identify the agency's preferred alternative (if one exists) and that may modify alternatives or the proposed action, develop and evaluate alternatives not previously given serious consideration, supplement or improve its analysis, make factual corrections, or explain why comments do not warrant further response, *id.* §§ 1502.9(b), 1503.4(a)(1-5), 1502.14(2); and

(6) circulation of final EIS to the public and filed with the Environmental Protection Agency (EPA), with notice of the EPA filing published in the Federal Register. *Id.* §§ 1502.19, 1506.9, 1506.10(a).

Then, after completion of the final EIS and review of its findings, the agency must issue a "concise public record of decision" that documents the agency's final decision based on the final EIS. *Id.* § 1505.2. If there are "substantial changes in the proposed action" or "significant new circumstances or information" relevant to environmental concerns in this process, the agency must prepare a supplemental EIS to take account of the new impacts. *Id.* § 1502.9.

## V. THE 2002 MANAGEMENT PLAN AND THE 2011 MAIN POST UPDATE

### A. The 2002 Management Plan

In May 2002, the Trust published the *Presidio Trust Management Plan, Land Use Policies for Area B of the Presidio of San Francisco* ("2002 Plan"), AR 27515-28848. The 2002 Plan articulated the Trust's "planning concepts and planning guidelines" for the seven districts within the Presidio: the Main Post, the Area B section of Crissy Field, Letterman, Fort Scott, Public Health Service, East Housing, and South Hills. AR 27600; *see* AR 27532-3, 27603-10. AR 27532 (reproduced below as Ex. 2) shows the seven districts. The area marked "1" is the Main Post.

The Main Post planning concept stated that the "rich collection of historic buildings and landscapes will be the backdrop for visitor programs and a setting for businesses, organizations, and Presidio community services. Significant open spaces will be preserved and restored." AR 27603. More specifically,

Preferred land uses will include offices, cultural/educational uses, and housing complemented by small-scale lodging and conference space, recreation, and some supporting retail services. Existing administrative and operational functions, such as the fire station, Presidio Trust headquarters, National Park Service Visitor Center, and child care center, will remain at the Main Post. The Officers' Club will continue to be used for meetings, cultural events, and community activities. Existing historical buildings at the Main Post will be rehabilitated and leased.

. . .

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Some new construction may be considered in the future to reinforce historic patterns of
2  spatial organization and complement the rehabilitation of adjacent historic buildings.
   Building additions or new infill construction will be carefully integrated into the post's
3  landscape and carried out in accordance with the planning guidelines set forth in this Plan
   (see below).

4  AR 27603-04.  With regard to new construction:

5  Every reasonable effort will be made to adapt historic properties to new uses.  New
6  construction will only be undertaken to encourage reuse of historic buildings and to achieve
   other Plan objectives.

7  New construction may take the form of a building addition, an annex adjacent to an existing
8  building, infill buildings set within an existing building cluster, or stand-alone structures in
   developed areas to replace square footage removed in that location or elsewhere. . . . In other
9  instances, a freestanding building or connecting annex may be needed to enhance the
   function of adjacent historic buildings or landscapes or to make their rehabilitation and reuse
10 economically viable.

11 New construction will be limited to existing areas of development, as stipulated in the
   Presidio Trust Act, and sited to minimize impacts on cultural and natural resources.  In
12 accordance with the NHPA, the design of new construction will ensure that the association,
   feeling, and setting of the significant elements and the integrity of the National Historic
13 Landmark District are protected.  New construction will reinforce historic character-defining
   features, as defined in the Planning District guidelines. . . . Additional opportunities for
14 public input and review will be provided before any major new construction is undertaken.

15 AR 27542-43.

16 The 2002 Plan provided for 200,000 to 260,000 square feet of lodging in several areas of the

17 Presidio with approximately 51,000 square feet in the Main Post.  *See* AR 27581-82.

18 The 2002 Plan also provided that the Trust would evaluate plan's effectiveness on an ongoing

19 basis and that amendments might be necessary.  AR 27677.  For example:

20 If revenues exceed expectations, the Trust could decide to accelerate park resource
   enhancement projects, reduce rents, scale back total building square footage, or increase
21 support for programs and services for park visitors.  If revenues are less than expected, Plan
   adjustments may be necessary, and the time it takes to complete the capital program will
22 increase.

23 At times, planning proposals may be considered that are not entirely consistent with this
   Plan. These proposals will be fully reviewed and considered under the National
24 Environmental Policy Act (NEPA), including all applicable public processes.  The final
   decision on the proposal may constitute a Plan amendment and will be informed by the
25 NEPA public review process for the proposal.  The decision amending the Plan will be
   adopted by resolution of the Presidio Trust Board.

26

27 AR 27677.

28 The Trust also prepared a Final Environmental Impact Statement for the 2002 Plan ("2002 EIS").

*See* 2002 EIS, AR 27711-28175 (Vol. I), 28176-28536 (Vol. II Response to Comments), 28537-28848 (Vol. III Appendices).  The 2002 EIS evaluates a number of alternatives to the 2002 Plan. *See* 2002 EIS, *passim*.

On August 23, 2002, the Trust approved and adopted the 2002 Plan over the alternatives and authorized a Record of Decision that memorialized the Trust's reasoning.  *See* Trust Resolution 02-19, AR 27432; 2002 Plan Record of Decision, AR 27430, *et seq.*  In the 2002 Plan Record of Decision, the Trust discussed plans for developing lodging in the Presidio:

> PMTP [the 2002 Plan] provides for a modest amount – less than, for example, the [General Management Plan Amendment] – of different kinds of lodging in different locations of the Presidio.  Rehabilitating certain Presidio structures for reuse as overnight accommodations is both an effective strategy for reuse of an historic building and a traditional use within national parks.  To allow visitors to the Presidio the opportunity to stay overnight in an historic structure is a qualitatively different way to experience the park and is not comparable to accommodations offered outside the park's gates.  The Trust views the modest lodging goals of the 2002 Plan as desirable within the mix of visitor-serving uses.

AR 27448.

## B. Development Proposals for the Main Post

In 2002 and 2003, the Trust began planning development of the Main Parade Ground section of the Main Post.  *See* AR 27254-61, 27074-75, 25693-703.  In 2004, the Trust held a series of workshops regarding the draft plans for the Main Parade Ground.  AR 25571-94, 25439-569, 25187-298, 24725-65, 24687-722.  After preparing environmental assessments to comply with the NEPA, the Trust replaced the paved parking lot covering the Main Parade with a lawn.  AR 20388.  After further environmental assessments, the Trust rehabilitated and built additions to the former Montgomery Street Barracks to accommodate the Walt Disney Family Museum and the International Center to End Violence.  AR 23185.

In 2005 and 2006, the Trust and its consultants privately considered the possibility of building a hotel at the Main Post.  For example, in October 2005, Trust documents refer to a "Presidio Lodge" on the East side of the Main Parade.  *See* Summary of Proposed Main Post Uses, AR 24245; Main Parade Ground Drawing, AR 24246 (noting that Presidio Lodge would have conference / meeting rooms, a restaurant / café, galleries, a bookstore, and retail).  A November 2005 confidential draft document titled "Main Post Implementation Strategy" contains a map that shows a proposed

UNITED STATES DISTRICT COURT
For the Northern District of California

Presidio Lodge that would require 28,000 square feet of new construction. *See* AR 24192. In early 2006, the Trust contracted with PKF Consulting to prepare a lodging feasibility study. *See* AR 23379 (6/1/2006 Confidential Presidio Trust Staff Report Re: Lodging Update). PKF Consulting suggested a successful project might be a "60- to 100-room, four star boutique hotel with an all-purpose restaurant and approximately 5,000 sf of meeting space." AR 23379 (quoting 2/14/2006 Preliminary Findings Proposed Main Post Hotel, at AR 24012 (misquotation in original)). The Trust hired PKF "to prepare a lodging RFP for the Main Post." AR 23379.

The Trust began the regulatory groundwork for the Presidio Lodge project in Fall 2006. In October, the Trust released a request for expressions of interest in developing a hotel on the Main Post. AR 23080-95. In November, it announced the beginning of public scoping for the Presidio Lodge environmental assessment and invited the public to attend an information meeting and "submit comments on the scope, the range of alternatives, and the issues that should be examined" in the environmental assessment. AR 22967; *see* AR 1024. The Trust announced that it was "accepting proposal from qualified developers to construct (through building rehabilitation and/or new infill construction) an approximately 60,000-80,000 square e-foot (80-100 rooms) lodging facility at the Main Post." AR 22967. Both the request for expressions of interest and the scoping notice identified several different sites for the Presidio Lodge. *See* AR 22969, 23089-91. In late 2006 and early 2007, the Trust initiated consultation under Section 106 of the NHPA, held public scoping meetings regarding the proposed project, and developed a Request for Proposals to interested developers. AR 007, 1024-25, 17237-38, 22354-406, 22889. The Trust held a public meeting on May 10, 2007 to hear presentations from the finalists for the Presidio Lodge RFP. 72 Fed. Reg. 20390 (Apr. 24, 2007) (notice of meeting); AR 22354-406 (May 10, 2007 Trust board of directors meeting minutes).

The Trust also received an offer from benefactors to build a public museum in the Presidio to display their contemporary art collection and began the NEPA and NHPA processes for considering this proposal in August 2007. *See* AR 1025, 21293. On August 8, 2007, the Trust issued a request for proposals to build "cultural institutions" on the Main Post. AR 21293. On August 14, the Trust published a Notice of Intent to prepare an environmental impact statement and conduct public

UNITED STATES DISTRICT COURT
For the Northern District of California

scoping for the museum proposal. *See* 72 Fed. Reg. 45469 (Aug. 14, 2007). The Notice of Intent explained that the Trust intended to prepare an EIS because "the Project Site was not identified as a 'preferred location for a large museum'" in the 2002 Plan. *Id.*

The Trust held a public meeting on the museum EIS and received a number of comments on the museum proposal. *See* 72 Fed. Reg. 61191 (Oct. 29, 2007). The Trust explained that "[s]everal of the interested parties urged that the proposed museum, when viewed with other proposed actions, would have cumulatively significant impacts on the environment and should therefore be addressed in a single EIS." *Id.* The Trust said that it would respond to this public concern by terminating the EIS process for the proposed museum. *Id.* Instead of a separate EIS process, the Trust would supplement the 2002 Plan EIS to "assess the cumulative impacts of all reasonably foreseeable Trust actions at the Main Post" including "the Presidio Museum, the Presidio Lodge . . . , other potential building construction or demolition within the district, the El Presidio site, and parking and circulation improvements." *Id.*

**C. The Main Post Update**

In order to revise the 2002 Plan, the Trust began a new NEPA process. *See id.*; AR 20435-36 (Oct. 23, 2007 Notice of Intent). The Trust held a public meeting to accept comments on the scope of the supplemental EIS on November 9, 2007. AR 17268. By the close of the public scoping period, the Trust had received 271 comment letters and e-mails about the supplemental EIS, including letters from the Presidio Historical Association, the Sierra Club, and the National Park Service. *Id.*; *see* AR 19548-75 (PHA scoping comments), 19591-96 (Sierra Club Presidio Committee scoping comments), 19533-37 (NPS scoping comments).

As before, the Trust reinitiated a section 106 consultation that proceeded at the same time as the NEPA review process. The Trust consulted with the designated State Historic Preservation Officer and other interested agencies under section 106. *See* AR 20163-74 (consultation letters sent to SHPO and entities including the Presidio Historical Association). The Trust specifically noted that "[t]he Main Post is an historic complex within the Presidio of San Francisco National Historic Landmark District and many of the buildings, landscape features, and sites contribute to the Landmark Status." *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The next sections review the evolution of the proposed Presidio Lodge site.

2        ***1. The Draft Supplemental Environmental Impact Statement & Section 106 Process***

3    In June 2008, the Trust released the Draft Supplemental Environmental Impact Statement for the

4    Main Post Update ("Draft SEIS").  AR 16964-17328.  The Draft SEIS analyzed five alternatives for

5    the proposed action.  *See* AR 16974-77 (summarizing the alternatives), 16975 (table with

6    alternatives; attached as Appendix A).

7        The Trust identified Alternative 2 as its proposed action.  Alternative 2 provided for up to

8    145,000 square feet of demolition and up to 265,000 square feet of new construction.  AR 17001.

9    The existing building area in the Main Post increased from 1.148 million to 1.289 million square

10   feet.  AR 17017.  The proposed new construction included the Lodge, a contemporary art museum,

11   and an addition to the Presidio Theatre.  AR 17017.  Alternative 2 also included an orientation

12   center, an archaeology center, and a small hotel in historic Pershing Hall.  AR 17015,17009.  In

13   addition, the archaeological remains of El Presidio – the colonial settlement – would be highlighted

14   through archeological excavation and interpretive displays.  AR 17023-27.

15       Under the Trust's proposed action, the Lodge would be located between the Main Parade and

16   Graham street.  *See* AR 17030 (aerial layout of Alternative 2), 17174 (shows Alternative 2;

17   reproduced below in Ex. 6).  The Lodge would be new construction on the site of existing building

18   34 (which would be demolished) and a parcel immediately south of it.  AR 017017, 17174

19   (reproduced below in Ex. 6) (Building 34).  It "would include up to 125 guest rooms in 95,000

20   square feet of new construction in a three-story building subdivided into a series of pavilions . . . not

21   exceeding an average 45 feet in height."  AR 17023-25.

22       The Draft SEIS went through an extensive public comment period.  The Trust extended the

23   comment period four times from July 31, 2008 to December 15, 2008.  *See* 73 Fed. Reg. 45092; 73

24   Fed. Reg 53295; 73 Fed. Reg 60368; 73 Fed. Reg. 67898-02.  In July and December 2008, the Trust

25   held public meetings with a combined attendance of 900 people.  AR 1026.  In addition, the Trust

26   conducted 23 guided walks during summer 2008 to discuss the proposals and accept public comment

27   cards on the Draft SEIS.  *Id.*  Over 1,500 people attended the walks.  *Id.*  The Trust hosted five

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   workshops to discuss aspects of the proposals.[6]  *Id.*  By the close of the notice period, the Trust

2   received comments from "5 public agencies, 1 elected official, 51 organizations, and 2,343

3   individuals."  AR 1026.

4        The Trust continued the NHPA section 106 consultation process in tandem with the NEPA

5   comment period and held consulting party meetings throughout 2008.  *See* AR 1029 (listing meeting

6   dates in February, September, and December 2008).  In August 2008, the Trust circulated for public

7   comment its Draft Finding of Effect under the NHPA.  *See* AR 9702.  In addition, the Trust held a

8   two-day design workshop in August 2008 with NPS representatives.  *See* AR 1029-30.

9        On December 8, 2008, the Trust announced that it had identified a preferred alternative that it

10   would analyze in a supplement to the Draft SEIS, which it released in February 2009.  AR 9702

11   (notice of intent); 73 Fed. Reg. 75777-01 (Dec. 12, 2008); AR 8032 (supplemental Draft SEIS).  In

12   the supplemental Draft SEIS, the Trust identified a preferred alternative that provided for a

13   contemporary art museum and related buildings to the South of the Main Parade and a smaller

14   Lodge (80,000 square feet).  AR 8066.  This new design split the Lodge into three or four structures

15   "of a style and height (not to exceed 45 feet above existing grade) that is compatible with the

16   adjacent historic Graham Street Barracks."  *Id.*  Compared with the 2002 Plan, the supplemental

17   Draft SEIS called for nearly six times as much demolition and twice as much new construction.  *See*

18   AR 8043.

19        The Trust again invited public comment on the supplemental Draft SEIS and extended the notice

20   and comment period several times.  AR 1027; *see* 74 Fed. Reg. 9817-18 (Mar. 6, 2009); 74 Fed.

21   Reg. 15264-01 (Apr. 3, 2009); 74 Fed. Reg. 18705-01 (Apr. 24, 2009).  It held public meetings and a

22   workshop, maintained a drop-in information center on the Main Post, and held two informal "open

23   houses."  AR 1027-28.

24        The parallel section 106 process continued too.  To that end, the Trust published a second Draft

25   Finding of Effect for the Main Post Update in February 2009.  *See* AR 8822.  While the Trust still

26

27        [6]  Three workshops covered the Draft SEIS and the alternative concepts for the Main Post,
    and one workshop was to "update the public about the compliance process, familiarize them with the
28   applicable standards for building in a historic site, and introduce most recent strategies that had been
    developed."  AR 1026.

1    found that the undertaking would have an adverse effect on the National Historic Landmark District,

2    this was "markedly less than that analyzed under the previous version of the Main Post Update."

3    AR 8826.

4        At the Advisory Council's request, *see* AR 14471, the NPS prepared a "section 213 Report" that

5    it released in April 2009.  *See* 16 U.S.C. § 470u[7]; AR 7626, *et seq.*  The NPS considered all of the

6    undertakings proposed and concluded the following:

> The proposed undertaking will have a significant adverse effect on an irreplaceable National
> Historic Landmark that is singular in it history and significance.  Fortunately, there are
> alternatives that would potentially avoid an adverse effect, or at the very least minimize and
> mitigate the effect.  Given the significance of the resource and the obligation of the Presidio
> Trust to minimize harm to this National Historic Landmark District to the maximum extent
> possible, we strongly encourage the Presidio Trust to take the recommendations under
> advisement.  We believe the recommendations will allow future generations the opportunity
> to experience and enjoy the historic character of the Presidio while they benefit from
> compatibly-sited and designed additions and sensitive rehabilitation projects.

12   AR 7635-36.  With regard to the Lodge, the NPS recommended that the Trust "[r]educe the

13   footprint, scale, massing, and height of the proposed lodge; break up the mass into separate

14   buildings, arranged in a manner that does not create a hard building plane/edge on the east side of

15   Main Parade Ground or remove the lodge from the Main Post."  AR 7635.

16       In May and June 2009, the California State Historic Preservation Officer and the Advisory

17   Council officially concurred with the revised Draft Finding of Effect, which meant that the Trust

18   could issue final Findings of Effect and the section 106 process could move into the "resolution"

19   phase.  *See* AR 6660-67, 4800-02.

20           ***2. Post-Museum Revisions***

21       In July 2009, the benefactors for the contemporary art museum publicly withdrew their proposal.

22   *See* AR 37904.  In response, the Trust revised the proposal in the Draft SEIS and supplemental

23   Draft.  *See* AR 008 (Record of Decision).  The newly revised proposal (the "mitigated preferred

24

25

26       [7]  As discussed above, section 213 of the NHPA provides that – at the request of the
     Advisory Council on Historic Preservation – the Secretary of the Interior (here through the National
27   Park Service) shall provide a report "detailing the significance of any historic property, describing
     the effects of any proposed undertaking on the affected property, and recommending measures to
28   avoid, minimize, or mitigate adverse effects."  16 U.S.C.A. § 470u.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

alternative") did not include an art museum but retained the Lodge.  *Id.*

Over the next year, the section 106 consulting parties worked to resolve concerns about the Main Post Update.  AR 1030.  According to the Record of Decision, "[c]onsultation meetings and focused design discussions in 2009 resulted in changes to the undertaking that have dramatically lessened the impacts on historic resources."  *Id.*

In November 2009, the Trust circulated the first draft of a Programmatic Agreement among the consulting parties, which included the Presidio Historical Association.  *Id.*  The draft Programmatic Agreement proposed a new design for the Lodge in the form of 12 buildings with new construction based on the historic (and demolished) Graham Street Barracks layout.  *Id.*  AR 3537 shows the location of the Graham Street Barracks that were demolished over 50 years ago by the Army, and AR 34489 shows the proposed Presidio Lodge at the same location.  *See* Ex. 4 (below).   AR 35478 is a picture of the now-demolished Graham Street Barracks.  *See* Ex. 5 (below).

The Trust accepted comments on the first draft Programmatic Agreement and responded specifically to the Presidio Historical Society's comments.  *See* AR 3523-33.  The Trust had additional meetings and "question-and-answer" sessions in December 2009 and January 2010.  AR 1030.

In March and August 2010, the Trust circulated revised "administrative drafts" of the Main Post Update and further revised drafts of the Programmatic Agreement.  *See* AR 2554, 805.  The Trust held additional meetings on September 14-15, 2010 to review the draft Programmatic Agreement and changes to the Main Post Update.  *See* AR 805, 1572-73.  On October 22, 2010, the Trust, the NPS, the Advisory Council, and the California Office of Historic Preservation jointly responded to this last round of comments.  *See* AR 1265-78.

The section 106 process concluded on October 26, 2010, when the Trust, the Advisory Council, the NPS, and the California State Historic Preservation Officer executed the final Programmatic Agreement.  AR 1224-62.  Other private organizations such as the National Trust for Historic Preservation, the Neighborhood Association for Presidio Planning, and San Francisco Architectural Heritage were concurring parties in the Programmatic Agreement.  AR 243-44, 246.  The Advisory Council sent the Trust a cover letter to the executed Programmatic Agreement that stated, "We

UNITED STATES DISTRICT COURT
For the Northern District of California

believe the PA does indeed fulfill the requirements of Section 110(f) of the NHPA as set forth in the Advisory Council's regulations at 36 CFR § 800.10, *Special Requirements for Protecting National Historic Landmarks*." AR 1224. Over the next several months, "consulting parties" (neighborhood and preservation groups) signed the Programmatic Agreement too.[8] AR 242-48.

### 3. The Final Supplemental Environmental Impact Statement and the Final Decision

The Trust issued the Final SEIS for the Main Post Update on November 26, 2010. AR 771-1109. The Final SEIS considered four alternative proposals, including the "Mitigated Preferred Alternative." AR 781-82. The Mitigated Preferred Alternative differed from the preferred alternative in the previous SEIS in several ways, including withdrawing the museum of contemporary art proposal, reducing the amount of new construction and limiting the size of the Lodge. AR 781. The Lodge had reduced square footage of 70,000 feet and reduced massing and height, and was broken into 12 buildings with a layout that would "approximate the pattern of the historic [Graham Street] barracks that once occupied the site." AR 817; *see* AR 781, 1085 (conceptual site plan for the Presidio Lodge), 35478/Ex. 5 (picture of the now-demolished Graham Street barracks), AR 35477 and 35489 (both in Ex. 4; shows Graham Street barracks in same location as proposed Presidio Lodge).

The Trust accepted public comments on the Final SEIS for 30 days after publication, later extended to 45 days. *See* AR 37-52, 686. On January 14, 2011, the NPS wrote to the Trust with comments on the Final SEIS. AR 37785-95. The NPS comments were largely positive. It noted that the Final SEIS presented

> a mitigated Preferred Alternative that is more in keeping with the historic character of the Main Post, the historic core of the Presidio, and that also emphasizes the preservation and protection of the Presidio's National Historic Landmark District (NHLD) status, by combining a focus on the rehabilitation and preservation of historic buildings and landscapes while providing for new programmatic opportunities for future park visitors.

> The revisions to the MPU, the Preferred Alternative, including the withdrawal of the museum of contemporary art, the reduction in the amount of new construction and the retention of additional contributing buildings, have addressed many of the issues and concerns that NPS

---

[8] These included: the Laurel Heights Improvement Association, the National Trust for Historic Preservation, Neighborhood Associations for Presidio Planning, the Cow Hollow Association, San Francisco Architectural Heritage, the Interfaith Center at the Presidio, and the Marina Community Association. AR 242-48.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  set forth in our June 9, 2009 letter to the Trust. The revised documents have also generally
2  responded to and incorporated the recommendations found in the 213 Report, which has also
   helped to avoid or minimize many of the adverse effect[s] of the proposed undertaking on the
3  Presidio NHLD.

4  AR 37785. The NPS still had some concerns about the Final SEIS and asked the Trust to consider

5  them in drafting the Record of Decision. AR 37785-86. With regard to the Lodge, the NPS stated:

6       The NPS believes that a new lodge at the Main Post is not the only means to "welcome
        visitors and animate the Main Parade" and that, as we've suggested, there are other ways to
7       achieve this goal, such as through rehabilitation of existing buildings at the Main Post, the
        establishment of a Visitor Center, and programs. The Preferred Alternative describes
8       activating the Montgomery Street Barracks with public uses, which would also accomplish
        this goal. We hope that the Trust's first priority will be to rehabilitate existing buildings at
9       the Main Post, rather than construct new ones.

10 AR 37789. The NPS also disagreed with the Trust's interpretation of the Trust Act provisions

11 regarding new construction and the Trust's "banking" theory about using square footage attributable

12 to demolished buildings to offset new construction (discussed below). AR 3794.

13      The Trust held a final public meeting on February 7, 2011 to hear comments on the Final SEIS

14 for the Main Post Update. *See* AR 253-349. At that meeting, the Western Office Director of

15 Program for the National Trust for Historic Preservation commented that "the National Trust would

16 like to note that in our experience it is rare for a federal agency to conduct as thorough a

17 consultation process as the Presidio Trust has done in this case." AR 299-300. The PHA and the

18 Sierra Club spoke at the meeting. *See* AR 301-02, 330-31 (PHA), 310-11 (Sierra Club).

19      On February 23, 2011, the Trust Board of Directors approved Resolution 11-6, which adopted

20 the Main Post Update to the Presidio Trust Management Plan. AR 58-60. The same day, the Trust

21 issued the Main Post Update Record of Decision, which contained responses to the final round of

22 public comments. *See* AR 01, 37-52 (responses).

23          ***4. An Illustration Of the Process and the Main Issue***

24      A summary of the above process is as follows. The proposed Presidio Lodge will replace

25 existing Building 34 on the Main Post. That area is the site of the Civil War-era Graham Street

26 Barracks that the Army demolished over 50 years ago. The proposals for the proposed Presidio

27 Lodge went through at least three iterations. In the final iteration, the proposed Presidio Lodge is a

28 number of small buildings that approximate and are on the footprint of the demolished barracks.

1   They also are on the site of existing Building 34 and exceed Building 34's square footage.

2       The main legal issue is about whether the size of the Presidio Lodge must be similar to Building

3   34 (as Plaintiffs argue) or whether it can be bigger (as the Trust argues) because buildings were

4   demolished nearby as part of the renovation of Doyle Drive.  The square footage issue is shown by

5   the following: (1) the square footage from the proposed demolitions at the Main Post (including

6   Building 34), is 93,939; (2) the square footage for new construction that includes the proposed

7   Presidio Lodge is 146,500 (distributed roughly across the footprint for the demolished Graham

8   Street); (3) the difference is 52,561; and (4) the square footage attributable to the demolition of

9   buildings during the Doyle Drive renovation is 54,071.  AR 996, 2757.

10      Exhibits 1 through 6 are visual depictions from the Administrative Record that show this.

11      Exhibit 1 (AR 35489) shows the Main Post, the existing buildings (including the existing

12  Montgomery Street Barracks across the Main Parade), and a rendering of the proposed Presidio

13  Lodge.  This shows how the Lodge fits into the existing space.

14      Exhibit 2 (AR 27532) shows the existing areas of development in Presidio Area B and their

15  geographic proximity.  Number 1 is the Main Post.

16      Exhibit 3 (AR 996 and 2757) shows the Main Post, the proposed Presidio Lodge in blue

17  superimposed on the footprint of the demolished Civil War-era barracks, and the three buildings

18  (605, 606, and 1158) demolished as part of the Doyle Drive project.  At the hearing, the government

19  asserted, and the Plaintiffs did not dispute, that the demolished buildings are about 500 to 600 feet

20  away from the Main Parade, and the administrative record supports this conclusion.

21      Exhibit 4 (AR 35477 and 35489) depicts the Main Post circa 1885 and the demolished barracks

22  (known as the Graham Street Barracks).  The second visual is a rendering of the Main Post Update

23  that shows the proposed Presidio Lodge on the same footprint as th Graham Street Barracks.

24      Exhibit 5 (AR 34578 & 35513) has a picture of the Graham Street Barracks as they appeared

25  from approximately 1860 to 1945 (when they were demolished) contrasted with a drawing of the

26  planned Presidio Lodge as approved in the final SEIS.

27      Exhibit 6 (AR 17174, 8033, 35513) shows the following: (1) Building 34, which under the Main

28  Post Update will be demolished and replaced by the Presidio Lodge; (2) the 95,000-square-foot

1   Presidio Lodge design in the Draft SEIS issued in June 2008; (3) the 80,000-square-foot proposed

2   lodge in the supplemental Draft SEIS issued in December 2008; and (4) the 70,000-square-foot

3   lodge in the final SEIS that was adopted in the Main Post Update in February 2011.  The schematics

4   show the evolution of design, scale, massing, and stepping down over the process.

**UNITED STATES DISTRICT COURT**
For the Northern District of California



# Main Post Update
## Illustrative Plan (AR 35489)

Presidio Chapel

Presidio Theatre

Lodge

Montgomery Street Barracks

Main Parade

Old Parade

Archaeology Lab & Curation Facilities

El Presidio

Ex.1



Generalized Areas of Development

San Francisco Bay

Pacific Ocean

Area A

Area B

Ex.2



# Additional Demolition Outside Main Post District

Grayscale map at AR 996.

New Construction     + 146,500

Main Post Demolition   - 93,939

Outside Demolition     - 54,071

**Net Sq. Ft. Decrease**    **- 1,510**



AR 2757

**Pending demolition**

| | | | | | |
|---|---|---|---|---|---|
| 1803 | 1,401 | No | PHSH | Non-historic building to be demolished by FCD | |
| 230 | 10,060 | Yes | Main Post | Doyle-related demolition | |
| 204 | 12,193 | Yes | Main Post | Doyle-related demolition | |
| 201 | 6,164 | Yes | Main Post | Doyle-related demo of 1/2 building | |
| 1158 | 4,336 | No | Letterman | Doyle-related demo | |
| 605 | 51,271 | No | Crissy Field | Doyle-related demo | Army gross ext is 42319 - sig |
| 606 | 9,011 | No | Crissy Field | Doyle-related demo | Army gross ext is 7416 - sign |
| 670 | 430 | Yes | Crissy Field | Doyle-related demo | |

Ex. 3

# Main Post, 1885

AR 35477



# Main Post Update

AR 35489



Presidio Lodge

Ex. 4

# Old Graham Street Barracks (approx. 1860-1945)





## Presidio Lodge

Ex. 5

# RENDERINGS OF THE PRESIDIO LODGE SITE



Existing Condition (Building 34)

AR 17174



Draft SEIS

AR 17174



Supplement to Draft SEIS

AR 8033



Final SEIS (Selected)

AR 35513

Ex. 6

UNITED STATES DISTRICT COURT
For the Northern District of California

**ANALYSIS**

This section starts with the standard of review for the final agency decision and then analyzes whether the agency decisions violated the Trust Act, the NHPA, or NEPA.[9]

## I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT UNDER THE APA

The Trust's February 2011 final decision is a final agency action subject to judicial review under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. §§ 704, 706; *Save the Peaks Coalition v. U.S. Forest Serv.*, 669 F.3d 1025, 1035 (9th Cir. 2012) (NEPA); *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (NEPA and NHPA).   The court sets aside agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A) and 706(C)(2).  Judicial review under the APA is deferential:

> Agency action should be overturned only when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations and citations omitted).

The summary-judgment review of the agency decision here involves no disputed facts that the court must resolve.  Instead, the court decides the legal question of "whether the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v.*

---

[9]   In its opening brief, the Trust challenged standing, arguing that Plaintiffs made too cursory a showing to establish either injury or injury traceable to the Main Post update.  *See* Def.'s Cross-Motion, ECF No. 29 at 24-6.  Plaintiffs submitted declarations with their opening brief and then more robust declarations in response to the Trust's argument.  *See* Hall Decl., ECF No. 31-1; Suppl. Evans Decl., ECF No. 31-2; Suppl. Widman Decl., ECF No. 31-3.  The Trust did not argue standing in its reply and confirmed at the May 16 hearing that it did not contest standing based on the new declarations.  In any event, the organizations established standing.  The individuals' declarations establish injury traceable to the agency decision that would be addressed by a favorable decision.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 180–81, 185 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Valley Forge Christian College,* 454 U.S. at 472; *Sahni*, 83 F.3d at 1057.  The organizations also show that the interests at issue are germane to the organizations' purposes, and the claims and the relief do not require the members' individual participation.  *See Summers v. Earth Island Institute*, 555 U.S. 488, 193-94 (2009).

1    *I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985); *accord Pit River Tribe*, 469 F.3d at 778.

2    **II. THE PRESIDIO TRUST ACT**

3        Section 104(c)(1) of the Trust Act allows demolition of structures that cannot be rehabilitated

4    cost-effectively and are identified for demolition in the management plan.  No one disputes that

5    Building 34 can come down.  The Presidio Lodge project is bigger (but distributed across different

6    buildings).  *See* Ex. 6.  The Trust limits new construction as follows:  "new construction limited to

7    replacement of existing structures of similar size in existing areas of development."  Trust Act

8    § 104(c)(3).

9        Plaintiffs have two arguments: (A) "similar size" means that the new building must be the same

10   size as the demolished building , and (B) "existing areas of development" means that it must be in

11   the same planning district.  *See* Pls. Mot., ECF No. 25 at 10, 19-23.

12       The Trust responds that section 103(c)(3)'s limits are not that categorical.  Instead, the Act limits

13   development in Area B to "existing areas of development" [plural], bars expanded development

14   beyond that, and bars new construction in undeveloped areas.  Def.'s Mot./Opp., ECF No. 29 at 27.

15   The Trust asserts that it has done precisely this.

16       **A.  Building of Similar Size**

17       Plaintiffs assert that "existing structures of similar size" means "one down, one up."  Pls. Mot.,

18   ECF No. 25 at 19.  They argue that the Trust Act's limit is like the GGNRA Act's restrictions on

19   new construction by the Army in the period that preceded transfer of the Presidio to the Secretary of

20   the Interior.  Those limits allowed the Army to demolish or reconstruct its buildings, but if it wanted

21   to replace them, it could do so only with a building of similar size, and only after consultation with

22   the Department of the Interior and a noticed hearing:

23           New construction and development . . . on the lands [to be transferred] under the jurisdiction of a
             department other than that of the Secretary [of the Interior] is prohibited, except that
24           improvements on lands which have not been transferred to his administration may be
             reconstructed or demolished.  Any structure which is demolished may be replaced with an
25           improvement of similar size, following consultation with the Secretary or his designated
             representative, who shall conduct a public hearing at a location in the general location in the
26           general vicinity of the area, notice of which shall be given at least one week prior to the date
             thereof.  The foregoing limitation on construction and development shall not apply to expansion
27           of those facilities known as Letterman General Hospital or the Western Medical Institute of
             Research.
28
     16 U.S.C. § 460bb-2(i).

The Trust Act's limitation of new construction to "replacement of existing structures of similar size in existing areas of development" on its face is different than the GGNRA Act's limit of replacing a demolished structure "with an improvement of similar size." While the Trust Act limits new construction, the Trust need not replace a specific demolished structure. It can replace "existing structures." The Trust Act thus caps the total amount of development in the Presidio's existing "areas of development." This constraint on new construction is about maintaining the scope of development in the Presidio and is not the jot-for-jot replacement that Plaintiffs propose.

Considering the statutory context of the GGNRA and Trust Acts reinforces this conclusion. The restriction on the Army makes sense: new construction was limited to maintaining existing functions and not expanding them pending the transfer to the NPS. The Trust Act, by contrast, is a comprehensive program about the Presidio as a park: the Trust is to administer the "leasing, maintenance, rehabilitation, repair, and improvement of property within the Presidio" in accordance with the GGRNA Act's purpose to use resources for "recreational and educational opportunities" and to "preserve the recreation area . . . in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." Trust Act, § 104(c) ; GGNRA Act, § 1, 16 U.S.C. § 460bb.[10] It also has a mandate to manage the Presidio to reduce NPS expenditures and "increase revenues to the Federal government to the maximum extent possible." Trust Act, § 104(c).

**B. Existing Areas of Development**

The next issue about "replacement of existing structures of similar size in existing areas of development" is, what does "existing areas of development" mean?

To put this in context, the square footage for the proposed project does not exceed square footage for buildings that have been demolished, but three of the demolished buildings are not in the Main Post planning district but instead are about 500 to 600 feet away from the Main Parade. *See supra* Ex. 3. The demolished square footage on the Main Post is 93,939, the square footage for new

_____

[10] For this reason, the court finds unpersuasive Plaintiffs' argument that *Sierra Club v. Marsh*, No. C-86-0289 WWS (N.D. Cal. Feb. 14, 1986), is dispositive. *See id.* (in record at ECF No. 25-1; holding that the GGNRA Act limited the Army to one down/one up).

1   construction that includes the proposed Presidio Lodge is 146,500, the difference is 52,561, and the

2   square footage attributable to the demolition of buildings nearby (but not on Main Post) is 54,071.

3   AR 996, 2757.  The parties dispute whether the limit "structures of similar size in existing areas of

4   development" means that the square footage of a project on the Main Post (1) is limited to the square

5   footage of buildings demolished on the Main Post or (2) may include the square footage of the

6   nearby buildings.

7       The statute's plain language does not limit construction to the Main Post.  "[R]eplacement of

8   existing structures of similar size in existing areas of development" talks about "areas" of

9   development.  As Exhibit 2 shows, the Presidio has areas of development and areas of open space.

10  The Main Post and the other buildings are next to each other.

11      In reaching a conclusion that the Trust acted within its statutory authority, the court need not

12  decide (and does not hold) that the Trust can "bank" square footage from any area of development or

13  one planning district and use it as it chooses in another area or district.  What drives the decision is

14  what actually happened here, as discussed in the next section.

15  **C.  At Worst, the Statute is Ambiguous, and Chevron Deference Applies**

16      The court's view is the plain language does not lock the Presidio Trust into the categorical rules

17  of development that Plaintiffs propose.  Congress could have written the statute that way if it wanted

18  to.  Instead, the Trust Act gives the Trust the authority to do what it did here: develop a program to

19  manage the Presidio lands and facilities in a way that limits new construction in scope and size to

20  the existing areas of development consistent with (1) the GGNRA Act's purpose of promoting the

21  recreational use of the park "in its natural setting" and preventing development that destroys the

22  park's "scenic beauty and natural character" and (2) the Trust Act's mandate to "reduce

23  expenditures by the National Park Service and increase revenues to the Federal Government to the

24  maximum extent possible."  Trust Act, § 104(c); 16 U.S.C. § 460bb.

25      One has to consider the Trust's development authority under the statute practically.

26  "[R]eplacement of existing structures of similar size in existing areas of development" is about

27  keeping the scale of development consistent with the size of development in current "areas" of

28  development.  The plain language of the statute does not suggest a categorical limitation that

UNITED STATES DISTRICT COURT
For the Northern District of California

requires the Presidio Trust to keep development to exactly what is there now in each planning district on the same footprint (which is what Plaintiffs proposed at the hearing). That would mean that a reconstruction of the cement-block Building 34 would look a lot like Building 34 as opposed to a more context-appropriate evocation of the previously-demolished historic Graham Street Barracks.

Plaintiffs nonetheless argued this categorical rule at the hearing, saying that the Trust had to keep the Presidio's buildings as they got them in 1994. That cannot be right given the GGNRA Act's purpose about promoting the use of the park as park. Parks have lodges, and this lodge – more than the existing cement-block Building 34 – is compatible in style to the historic Main Post. The Trust proposes replacing Building 34 with 12 small buildings that are scaled down and distributed across the footprint of, and that approximate in scale and scope, the old barracks that the Army demolished some 50-plus years ago. *See* Exs. 6, 5. To comply with its mandate to limit development to "replacement of existing structures of similar size in existing areas of development," the Trust used square footage from demolished buildings nearby. The Trust's prior development provides context too: the Trust previously removed the parking lot that masked the historic Main Parade, replanted the lawn, and rehabilitated and built additions to two of the Montgomery Street barracks for the Walt Disney Family Museum and the International Center to End Violence. AR 2251, 20388, 23187, 20323. All of the development is consistent with Trust's authority to "utilize the [Presidio's] resources" to "provide for recreation and educational" opportunities and limit new construction in size and scope to "existing areas of development. Trust Act, §§ 104(c); GGNRA Act, § 1, 16 U.S.C. § 460bb. The development of a hotel (priced at around $200 a night) also is consistent with the Trust Act's mandate to decrease expenditures and "increase revenues to the Federal Government to the maximum extent possible." Trust Act, § 104(c).

At worst, the statute's "replacement of existing structures of similar size in existing areas of development" is ambiguous. The parties cite legislative history that goes both ways and that illustrates what Congress considered. *See, e.g.,* Pls.' Opp./Reply at 25 (statements of bill sponsors "that Congress had twin goals: to protect the Presidio while achieving financial self-sufficiency"); Def.'s Mot. at 30-32 (testimony that Trust Act permits banking demolished building space to offset

UNITED STATES DISTRICT COURT
For the Northern District of California

1   future construction). Even weighing sponsors' testimony as more illustrative of intent, the

2   legislative history does not mandate an outcome that differs from the proposed lodge.

3       Assuming an ambiguous statute, the court gives *Chevron* deference to the agency's decision.

4   *See* Def.'s Mot./Opp.., ECF No. 29 at 29, 33-34 (*Chevron* deference appropriate); Pls.' Opp./Reply,

5   ECF No. 31 at 28-29 (*Chevron* doctrine applies). Under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467

6   U.S. 837, 842-44 (1984), an agency's interpretation of a statute that it administers must be affirmed

7   if Congress has made an express delegation to the agency, and the agency's construction is not

8   arbitrary, capricious, or manifestly contrary to the statute. Congress delegated the authority to the

9   Trust under section 104(c) to develop a management program that included this limitation about new

10  construction. The agency's interpretation for the Main Post Update is not arbitrary, capricious, or

11  manifestly contrary to the statute, reflects a plausible construction of the statute, and does not

12  conflict with Congress's expressed intent (and, indeed, promotes both the use of the park in its

13  natural setting and the mandate to increase revenues). *See Chevron*, 467 U.S. at 842-44; *Oregon*

14  *Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1116 (9th Cir. 2006).

15  **III. NATIONAL HISTORIC PRESERVATION ACT**

16      The NHPA's statutory framework is set forth on pages 5 through 8. The parties dispute what

17  section 110(f) requires. Its text is as follows:

18      Prior to the approval of any federal undertaking which may directly and adversely affect any
        National Historic Landmark, the head of the responsible Federal agency shall, to the
19      maximum extent possible, undertake such planning and actions as may be necessary to
        minimize harm to such landmark, and shall afford the Advisory Council on Historic
20      Preservation a reasonable opportunity to comment on the undertaking.

21  16 U.S.C. § 470h-2(f). Plaintiffs argue that this imposes a substantive mandate to "take all

22  reasonable actions in order to minimize adverse effects to historic landmarks." Pls.' Mot., ECF No.

23  25 at 23; *see* Pls.' Opp./Reply, ECF No. 31 at 35 (must "undertake actions to minimize harm to the

24  maximum extent possible"). The Trust argues that section 110(f) imposes heightened procedural

25  protections and not substantive obligations. Def.'s Mot./Opp., ECF No. 29 at 32-33.

26      The landmark here is the Presidio itself. The issue is what the Trust had to do under NHPA

27  sections 106, 213, and 110(f). Regardless of whether 110(f) is substantive or procedural, the court

28  cannot see what else the Trust could have done besides not build the hotel at all. It conducted the

ORDER (C 12-00522 LB)                                34

UNITED STATES DISTRICT COURT
For the Northern District of California

1    section 106 consultation with 16 parties (including Plaintiffs) that resulted in a Programmatic

2    Agreement signed by the Trust, the Advisory Council, the NPS, and the California Office of Historic

3    Preservation.  *See supra* page 13-18.  Other private organizations were concurring parties.  *Id.* at 18.

4    The Advisory Council and Department of the Interior (through the NPS) participated fully in the

5    consultation, and the final result of the executed Programmatic Agreement was reported to the

6    Secretary of the Interior under section 110(f).  AR 1224, 35560; *see* 36 C.F.R. § 800.10.  At the

7    Advisory Council's request, the NPS prepared the section 213 report to explain the significance of

8    the property, describe the effects of the plan, and recommend measures to mitigate the effects.

9    AR 7627.  Plaintiffs point to the NPS's criticisms in the section 213 report (summarized on page 17).

10   But as Defendants respond, the report was prepared in mid-2009 and contemplated construction that

11   was 70% more than that approved in the final Main Post Update.  AR 817.  The final update has a

12   scaled-down project because the Trust – after completing the NHPA and NEPA processes –

13   addressed the NPS's concerns and reduced the project to minimize adverse effects.  Six historic

14   buildings initially were slated for destruction, and only one historic shed is subject to demolition

15   now.  AR 924.[11]  The 100,000-square-foot museum was eliminated from the final proposal, and – as

16   described in the previous section – the hotel itself was reduced in size and mass and now

17   approximates the scope and footprint of the historic Graham Street barracks.  AR 817.  Other issues

18   addressed include reducing the height to 30 feet, establishing setbacks from a historic building, and

19   changing the design substantially.  AR 1252, 1236; *see* Ex. 6.

20       To counter this, Plaintiffs argue that the changes reduced the visual impact but did not address

21   the large-scale effect of commercial activity.  Pls.' Mot., ECF No. 25 at 30.  They assert that the

22   "primary harm is the nature of the development:" a large, busy hotel in the heart of the landmark that

23   is the Presidio.  *Id.*  This harm cannot be mitigated by architectural style.  *Id.*  Thus, the Trust did not

24   mitigate harm to the landmark to the maximum extent possible because it did not eliminate the hotel.

25   *Id.*  But the statute and regulations do not mandate elimination and instead require harm to be

26   avoided, mitigated, or minimized.  *See* 36 C.F.R. § 800.1 (mentioning that harms can be avoided,

27

28       [11]  The Update proposes removing or relocating historic buildings 40 and 41 but takes no
     action, and further NHPA review will be completed before any action.  AR 35501, 1231, 1236.

1    mitigated, or minimized); AR 238 (Programmatic Agreement App. J) (defining minimization as "a

2    method or measure designed to lessen the intensity of an impact on a particular resources (i.e.

3    impacts related to new construction are made smaller by reducing or reallocating the total square

4    footage of new construction)"). That is exactly what happened here. The Trust redesigned the

5    project to minimize any detrimental effect on the Presidio.[12]

6    **IV. NATIONAL ENVIRONMENTAL POLICY ACT**

7        The Main Post Update is supported by an EIS for the 2002 management plan, a draft SEIS for

8    the Main Post Update, a Supplement to that Draft, and a Final SEIS. Plaintiffs argue that the Trust

9    nonetheless violated the NEPA by not considering a reasonable range of alternatives to the Presidio

10   Lodge and by adopting the final SEIS without recirculating it for public comment a final time. Pls.

11   Mot., ECF No. 25, at 31, 33.

12       **A. Reasonable Range of Alternatives**

13       Plaintiffs argue that the Trust failed to consider the following reasonable alternatives:  alternative

14   locations on the Main Post for the Lodge; reduced-scale lodging options within the Main Post; or

15   lodging outside the Main Post, possibly paired with a visitor center or history museum on the Main

16   Post. Pls.' Mot., ECF No. 25, at 31-33. The court holds that the Trust complied with the necessary

17   processes in the statutory and regulatory framework (set forth on pages 8 through 10), took the

18   necessary hard look at the environmental consequences of its proposed actions, and analyzed

19   reasonable alternatives. *See* 42 U.S.C. § 4332(2)(c) and (e); 40 C.F.R. § 1502.14; *Nat'l Parks &*

20   *Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010),

21       First, the EIS considered alternative lodging locations and sizes on the Main Post. The Final EIS

22   evaluated alternatives with 16,000, 43,000, 49,000, and 110,000 square feet of lodging. AR 807.

23   These included a new Lodge, a historic building, dormitories, and B&Bs. *See* AR 808. Lodging

24

25

26       [12] By signing the Programmatic Agreement, the Advisory Council and the NPS agreed that
     the Trust fulfilled its duties under section 100(f). AR 205-48; *see* AR 206 (Programmatic
27   Agreement Recitals state that  the Trust "through the consultation process and in compliance with
     the NHPA, including Sections 106 and 110(f), has modified the Undertaking to avoid, minimize or
28   mitigate the adverse effects identified in the *Finding of Effect for the Main Post Update*, and
     described this modified Undertaking in a *Final Main Post Update* (August 2010)").

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  was evaluated in Pershing Hall, Buildings 40 and 41, the proposed Lodge site, and the upper

2  Funston Avenue Officers' Quarters (Buildings 11-16).  *Id.*  To the extent Plaintiffs' criticism is that

3  the Trust did not consider building a lodge of the same size as the proposed Presidio Lodge but in a

4  different area of the Main Post, Plaintiffs do not show why that was a reasonable and obvious

5  option.

6      Second, as to Plaintiffs' contention about the failure to consider building a lodge outside the

7  Main Post, the statement of purpose and need for the Main Post Update was the goal of

8  implementing the Trust's vision of the Main Post as the "heart of the Presidio."  *See* AR 795.  "The

9  Main Post Update is needed because . . . the Main Post has not yet become the 'focal point for

10  visitor orientation' and 'lively pedestrian district' contemplated in the 2002 Plan."  AR 795.  The

11  statement identified three objectives in establishing the Main Post as the heart of the park: (1) reveal

12  the Presidio's history; (2) welcome the public; and (3) employ 21st century green practices.  AR

13  796.  With regard to welcoming the public, the Final EIS explained:

14      Although a community is growing in the Main Post and visitation has increased, the Main
Post is not yet the visitor destination foreseen by the Trust in the 2002 Plan.  Visitor services
15      and activities for the public are insufficient to draw people to the Main Post and make them
feel welcomed.  The number of people who live and work in the Main Post has not reached
16      the level that the district experienced when it was the center of a military post; on most days,
the Main Post feels empty.  The park has no lodging, a traditional way that national parks
17      have welcomed people, both those who visit for a day and those who want the experience of
an overnight stay in the park.

18

19  AR 798.

20      Given that the point of the Main Post Update is to increase visitor use of the Main Post and make

21  it a "lively pedestrian district," the Trust's evaluation of alternatives was appropriate.  "Under the

22  rule of reason, the EIS 'need not consider an infinite range of alternatives, only reasonable or

23  feasible ones.'"  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.

24  1997) (citing 40 C.F.R. § 1502.14(a)-(c)).  Moreover, the "range of alternatives that must be

25  considered in the EIS need not extend beyond those reasonably related to the purposes of the

26  project." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) (citing

27  *City of Angoon*, 803 F.2d at 1021-22); *see also Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d

28  1174, 1180 (9th Cir. 1990) (explaining that an agency is not required to "consider alternatives which

1  are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the

2  area").

3      Plaintiffs also argue that the SEIS is inadequate "due to its failure to inform the public of the

4  reasoning behind this conclusion." Pls.' Opp./Reply, ECF No. 31 at 39 n.12.  But the Trust

5  responded to such comments in the Final SEIS and explained that it had evaluated lodging options

6  off of the Main Post in the 2002 Plan, "and not again for the Main Post Update as they would not

7  meet the purpose and need of adding vitality to the Main Post District." AR 1170.  Plaintiffs assert

8  that the Trust's evaluation in 2002 was too long ago and did not analyze other areas outside the

9  Main Post such as Crissy Field.  Pls.' Opp./Reply, ECF No. 31 at 38.  But the process here was not a

10  2002 evaluation with a long break until the Main Post Update in 2011.  Instead, it was an evolving

11  process from 2002 through 2011 that fully complied with the CEQ regulations regarding the NEPA

12  process and that was geared throughout to enlivening the Main Post.  *See supra* pages 8-9, 11-19.

13  **B.  Whether NEPA Requires the Trust to Recirculate the Final SEIS**

14      Plaintiffs argue that when it eliminated the art museum and scaled down the Presidio Lodge to

15  approximate the Graham Street footprint, the Trust changed its preferred alternative and thus should

16  have recirculated the Final SEIS for public comment because the public could not have anticipated

17  these changes.[13]  Pls.' Mot., ECF No. 25 at 35-36.

18      Agencies may modify a proposed action in a draft EIS in light of public comment.  *See* 36 C.F.R.

19  § 1503.4; *California v. Block*, 690 F.2d 753, 771 (9th Cir. 1982).  The agency must prepare a

20  supplemental draft EIS if "[t]he agency makes *substantial changes* in the proposed action that are

21  *relevant to environmental concerns*." *Russell Cnty. Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037,

22  1047-48 (9th Cir. 2011) (emphasis in original) (quoting 40 C.F.R. § 1502.9(c)).  Under CEQ

23  guidance, supplementation is not required when two requirements are satisfied: (1) the new

24  alternative is a "minor variation of one of the alternatives discussed in the draft EIS," and (2) the

25  new alternative is "qualitatively within the spectrum of alternatives that were discussed in the draft

26  [EIS]."  *Id.* (applying the CEQ standard); *see* Forty Most Asked Questions Concerning CEQ's

27

28
_____

[13] Plaintiffs did not plead this theory.  The court addresses it on the merits anyway.

1  National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed. Reg. 18,026, 18,035

2  (Mar. 23, 1981).

3      The changes in the Lodge design between the Draft and Final SEIS were relatively modest and

4  served only to reduce the environmental impact of the plan. *See* AR 8033, 8186, 35513, 965; Ex.

5  5.[14]  The CEQ guidance mentions "utilizing a different configuration of buildings" as the example of

6  an alternative within the spectrum of those already considered. *See* Forty Questions at 18035 (an

7  EIS may analyze a spectrum of construction of 2,000, 4,000, or 6,000 units; a commentator might

8  urge 5,000 units utilizing a different configuration of uses; this alternative is within the spectrum of

9  alternatives already discussed and could be addressed in the final EIS).

10     Exhibit 5 is a good visual depiction of the evolution of the design from the supplement to the

11 Draft SEIS to the Final SEIS.  It shows the reduction in massing and height from 80,000 square feet

12 to 70,000 square feet and illustrates that the designs are in the same spectrum of alternatives.  The

13 Draft SEIS also analyzed alternatives without a museum, so the public had an opportunity to

14 comment on them.  *See* AR 17001-02, 35548-50.  The Trust also considered comments to the Final

15 SEIS in the 45-day waiting period.  AR 774, 683, 686 (extended 30-day waiting period to 45 days).

16 Plaintiffs submitted comments during that period, and the Trust responded to them in the Main Post

17 Update Record of Decision.  AR 37783-84, 301-02, 37-52.[15]

18     What happened here is that the Trust considered and adopted preferable revisions to the Main

19 Post Update in a process that does not violate the NEPA but instead fulfills its purpose.

20

21

22

23

24

25     [14]  Plaintiffs asked the Trust to make the design changes they now complain about.
   AR 21051.

26

27     [15]  In addition, it may be that the Plaintiffs cannot establish an injury under NEPA.  The
   Presidio Historical Association was very involved in the parallel section 106 process and had many

28 opportunities to comment on the plans.  *See, e.g.,* AR2554, 1940.  Both Plaintiffs submitted their
   comments on the Final SEIS before the Trust adopted it.  *See* AR 253 (2/7/11 Meeting Minutes).

**CONCLUSION**

The court DENIES Plaintiffs' Motion for Summary Judgment, GRANTS the Trust's Cross-Motion for Summary Judgment, and denies Plaintiffs' Request for Judicial Notice as unnecessary to this decision.  This disposes of ECF Nos. 25, 29, and 33.

**IT IS SO ORDERED.**

Dated: June 3, 2013

_____
LAUREL BEELER
United States Magistrate Judge

Appendix A

**SUMMARY OF ALTERNATIVES**
from AR 16975

| | **Alternative 1: PTMP Visitor and Community Center** | **Alternative 2: Culture and Heritage Center (Proposed Action)** | **Alternative 2A: Culture and Heritage Center w/ Modifications** | **Alternative 3: History Center** | **Alternative 4: Status Quo** |
|---|---|---|---|---|---|
| **EXISTING TOTAL BUILDING AREA (square feet)** | 1,148,000 | 1,148,000 | 1,148,000 | 1,148,000 | 1,148,000 |
| **MAXIMUM BUILDING AREA (square feet)** | 1,212,000 | 1,289,000 | 1,273,000 | 1,161,000 | 1,140,000 |
| **MAXIMUM DEMOLITION (square feet)** | 46,000 | 145,000 | 161,000 | 64,000 | 34,000 |
| **MAXIMUM NEW CONSTRUCTION (square feet)** | 110,000 | 265,000 | 265,000 | 77,000 | 26,000 |
| **KEY PROPOSALS** | Contemporary Art Museum at Commissary, Lodging at Pershing Hall | Contemporary Art Museum South of Main Parade and in Building 101, Lodging at Building 34 Site and Pershing Hall, Orientation Center at Officers' Club | Same as Alternative 2 except Contemporary Art Museum North of Infantry Terrace and Restaurant along Anza Esplanade | History Center South of Main Parade, Lodging at Pershing Hall & B&B Inns in upper Funston Avenue Officers' Quarters, Contemporary Art Museum at Fort Scott | None |